JERRY HARMON MOTORS, INC., a North Dakota corporation, Plaintiff and Appellee,

v.

The FARMERS UNION GRAIN TERMI-NAL ASSOCIATION, a foreign corpo-ration, Defendant and Appellant.

Civ. No. 10380.

Supreme Court of North Dakota.

Aug. 4, 1983.

McIntee & Whisenand, Williston, for plaintiff and appellee; argued by Frederick E. Whisenand, Jr., Williston.

Pringle & Herigstad, Minot, for defend-ant and appellant; argued by Mitchell Ma-honey, Minot.

SAND, Justice.

Farmers Union Grain Terminal Association (GTA) appealed from a district court judgment determining that GTA's actions in discharging dust, chaff, and grindings into the atmosphere and onto Jerry Harmon Motors, Inc. (Harmon Motors) new and used car and truck inventory constituted a private nuisance and awarding Harmon Motors $57,620.33 in damages.

Harmon Motors has owned and operated a motor vehicle dealership located at 1106 West Second Street in Williston, North Dakota since March 1975. GTA operated a feed plant located at 1201 West Second Street in Williston, North Dakota from 1958 until the plant burned down in January 1982. The feed plant had been at that location under other ownership since 1930. GTA's feed plant was located across Second Street to the south and southwest of Harmon Motors' display lot for new and used cars. In 1976 Harmon Motors obtained additional land and expanded its display lot, and began displaying cars on the additional lots in the summer of 1977. The additional lots were directly north of GTA's feed lot. Jerry Harmon and his employees testified that they began to notice dust on the display cars after Harmon Motors expanded its operation in 1977. Dust was more evident in the front row of Harmon Motors' lot and became less noticeable in cars further away from GTA's feed plant. Harmon Motors asserted that, as a result of the dust, its costs in keeping its display cars clean increased.

Harmon Motors registered a complaint with GTA and, after that complaint was not resolved to its satisfaction, initiated this action against GTA alleging in substance that GTA's feed grinding and processing of feed was the direct and proximate result of dust and chaff settling on cars in its display lot; that because dust settled on its display cars, Harmon Motors had to continually clean the vehicles at an additional cost of $150,000, so that the vehicles would be more attractive for resale; and that GTA's activities constituted a private nuisance.

The court, after a bench trial, issued a memorandum opinion determining that GTA's actions constituted a private nuisance and that Harmon Motors had sustained damages of $57,620.33. Findings of fact, conclusions of law, and order for judgment and judgment were entered, and GTA appealed from that judgment.

GTA, on appeal, contended and argued that (1) the decision of the district court was fully reviewable by this court and not subject to the clearly erroneous standard of North Dakota Rule of Civil Procedure 52(a); (2) the findings of fact were erroneous and did not justify the legal conclusions that the GTA plant was a private nuisance; and (3) the facts did not support the award of $57,620.33 in damages.

These issues are interrelated and involve many of the same principles and concepts of law and will be considered and discussed together rather than separately.

Our laws concerning nuisances are found in NDCC Ch. 42–01. NDCC § 42–01–02 provides that:

"A private nuisance is one which affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the public."

NDCC § 42–01–01 defines a nuisance as follows:

"Nuisance—Definition.—A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:

1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;

2. Offends decency;

3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or

4. In any way renders other persons insecure in life or in the use of property."

Initially, we note that Harmon Motors did not contend or argue that the activities of GTA were unlawful or constituted a health hazard. Therefore, we must determine if GTA's activities constituted an omission to perform a duty contrary to subsections 1, 2, 3 or 4 of NDCC § 42–01–01.

The trial court found as a fact that GTA ground and processed various types of feed and manufactured feed pellets at its plant and, as a result, substantial amounts of dust, chaff, and grindings were discharged into the atmosphere when there was no wind, and more specifically when the wind was blowing from the south, southwest, and west. The trial court found that those particles fell and settled upon the new and used car and truck inventory, causing Harmon Motors to incur additional costs and expenses in washing and maintaining the motor vehicles on display; that the total expense incurred by Harmon Motors from the years 1977 to 1981 in washing and maintaining the new and used motor vehicle inventory amounted to $199,370.30. The court then found that Harmon Motors was damaged in the sum of $57,620.33 during the five-year period of time. Apparently this figure was reached by multiplying the total expenditures of Harmon Motors for washing cars during the five-year period by 28.9% which was the time established that the wind blew from the south, southwest, and west. The trial court, in its findings of fact and its conclusions of law, stated that the activities of GTA constituted a private nuisance.

GTA argued and contended that Rule 52(a) of the North Dakota Rules of Civil Procedure does not apply to the trial court's findings that its activities constituted a private nuisance because that determination was a mixture of law and fact, and, as a consequence, was fully reviewable. See *Earth Builders, Inc. v. State of North Dakota,* 325 N.W.2d 258 (N.D.1982) [determination that highway department leased sand and gravel rights in good faith without notice of competing interest is mixed question of law and fact]; *Jerry Harmon Motors, Inc. v. Heth,* 316 N.W.2d 324 (N.D. 1982) [findings of trial court were a mixture of findings of fact and conclusions of law]; and *Wallwork Lease and Rental v. JNJ Investments,* 303 N.W.2d 545 (N.D. 1981) [findings which are mixed questions of law and fact are not governed by "clearly erroneous" standard]. Additionally, GTA contended that even if the clearly erroneous standard of Rule 52(a) applied, this court should rule that the finding of a private nuisance was erroneous.

Harmon Motors, in response, cited *Teinen v. Lally,* 10 N.D. 153, 86 N.W. 356 (1901), and *State v. Hooker,* 87 N.W.2d 337 (N.D. 1957) wherein this court essentially stated that the question of whether or not a nuisance exists is a question of fact.

In *Slope County, Etc. v. Consolidation Coal Co.,* 277 N.W.2d 124 (N.D.1979) we, in effect, said that whether a finding is a "finding of fact" or a "conclusion of law" depends on the manner by which it is reached. If it is reached by natural reasoning, it is a finding of fact, but if it is reached by fixed rules of law or if the ultimate conclusion can be arrived at only by applying rules of law, the result is a "conclusion of law." We also said:

"'A "finding of fact" is a conclusion drawn by way of reasonable inference from the evidence. *State Acting By and Through Oregon State Board of Higher Education v. Cummings,* 205 Or. 500, 288 P.2d 1036, 1051, 289 P.2d 1083; *Griffith v. Gardner,* 9 Cir., 196 F.2d 698.'

"Thus, it has been said that if facts are undisputed and only one, if any, inference can reasonably be drawn from those facts, the determination of that inference is a question of law. When, however, facts are not in dispute but permit the drawing of difference inferences, the drawing of one such permissible inference is said to be a finding of fact. *Village of Prentice v. Industrial Commission,* 38 Wis.2d 219, 156 N.W.2d 482 (1968). Findings of fact are the realities as disclosed by the evidence as distinguished from their legal effect or consequences. *Cortner v. National Cash Register Co.,* 25 Ohio Misc. 156, 262 N.E.2d 586, 588

(1970)." *Slope Cty., Etc. v. Consolidation Coal Co.*, 277 N.W.2d at 127.

■ Although *Teinen v. Lally, supra,* and *State v. Hooker, supra,* suggest that a determination of whether or not a nuisance exists is a question of fact, we believe the statements and rationale of the court in those two cases established that this court was, in effect, saying that the facts must first be established in order to determine whether or not a nuisance exists. It is elementary that without facts it is virtually impossible to determine if a nuisance exists. The law can only be applied to facts. Once a factual determination has been made based on the evidence submitted, then the law may be applied to the facts to determine if those facts constitute a nuisance. The application of a set of facts to a fixed rule of law to determine their legal effect becomes a conclusion of law. We agree that the various factual circumstances of each case must be resolved before the rules of law may be applied to those circumstances to determine whether or not a nuisance exists; however, we believe the ultimate resolution of whether or not a nuisance exists, based on the facts and circumstances of each case, is a conclusion of law.

Harmon Motors is located in an area zoned C-2 "a general commercial district," and GTA was located in an area zoned N-1 "a light industrial district." No evidence was introduced that GTA was operating in violation of any city zoning ordinance or that GTA was in violation of any health ordinances. For that matter, the Williston zoning ordinance passed in 1970 provides for an exception for those businesses which were in operation when the zoning ordinance was adopted and GTA was in operation when that zoning ordinance was adopted. This, however, is not per se conclusive of the issues.

The gravamen of Harmon Motors' complaint[1] pertained to the dust and chaff on its cars which were on display in an open, outdoor parking lot, and the resulting additional cost to keep these cars clean. Harmon Motors presented evidence regarding its cost to keep the cars clean over a period of five years. The court found that the cars were laden with dust. However, the evidence established that the cars were next to a heavily traveled U.S. Highway, # 2, a business truck route, (Second Street) on which, during an average day, about 8,300 cars and 330 trucks (oil and mud trucks) passed. No evidence was introduced as to how often the streets were cleaned. Neither were samples of the dust on the cars introduced to determine the nature or source of the dust—whether it was ordinary street dust or dust from GTA's operation. Harmon Motors and its employees testified that the dust came out of a vent on the side of the elevator. GTA's employees and officers testified that steam and not dust came out of the vent. The pictures of the vent taken during the wintertime and which were admitted into evidence are inconclusive, but no effort was made by either side to produce scientific evidence to support its position. The court, nevertheless, found that the dust on the cars was the direct result of GTA's feed grinding operation.

In this respect we must recognize (see NDREv Rule 201) that any car or truck merely being outdoors and exposed to the elements becomes dirty and laden with dust. The amount of dust on a car varies depending on a number of other factors, such as the velocity of the wind, was the car standing still or moving, and what windbreak and shelter, if any, existed. Be that as it may, another legal issue, known as "coming to the nuisance," which is of prime importance and may virtually be dispositive of the issue, needs to be considered and resolved.

1. The complaint sought an injunction but GTA burned down and, as a result, the court did not rule on this point. It nevertheless raises an interesting point regarding what compensation, if any, GTA would have been entitled to if a permanent injunction would have been granted. This could also bring into focus a further question: May a newcomer demand the discontinuance of a legitimate use of property simply because the newcomer deems its use a nuisance to the newcomer? These questions, however, we need not decide at this time.

No one disputed that GTA, with its feed-grinding operation, was in operation sometime before Harmon Motors bought the used car lot in 1975 or expanded its display area in 1977. The testimony of Harmon's employees reflects that they did not notice the dust or chaff problem until Harmon Motors expanded its display area in 1977.

These factors lead us to conclude that the principle of law pertaining to individuals "coming to the nuisance" has application to the instant case. The various jurisdictions are split in their decisions involving the "coming to the nuisance" principle of law. For example, some jurisdictions have adopted the rule of law that coming to a nuisance is not a defense or estoppel to an action for a nuisance. Annot., 42 ALR3d 344, 347 (1972). Meanwhile, other jurisdictions have held that although coming to a nuisance does not constitute a defense or estoppel, it is one of the factors considered in determining whether or not a nuisance exists. *Id.* at 353.

The "coming to a nuisance" principle of law has not been before this court previously nor has this court specifically ruled on this subject which we now must consider. In determining what principles of law this court should develop or adopt and apply, we do not merely accept or align ourselves with what appears to be the majority view. We are virtually obligated to take into consideration a number of factors. We cannot disregard the obvious fact that our state is not as densely populated as many of the states which comprise or follow the majority view. North Dakota has many open spaces available which many of the industrial eastern states do not enjoy. We must also consider what role the alleged nuisance activity has with the general business activities of the community and state, which are primarily farming and agricultural. We must also take into consideration the question: how does such activity legally and economically fit into the state's general picture? Is it in harmony or in contrast? Is the activity, business, or enterprise regulated or supervised and, if so, by state or local government or both? Grain elevators and feed-grinding businesses are needed and support the farming and agricultural activities of this state. In addition, stability in legal and judicial matters cannot be overlooked.

After having considered the foregoing items, we conclude that an operation such as GTA has a positive rather than a negative impact in North Dakota.

Our research did not disclose that this state, either through executive action or judicial decisions, has indicated what the legal position should be in this state.

However, the North Dakota Legislature enacted into law House Bill No. 1461, 1981 Sess.Laws, which provides that an agricultural activity not a nuisance at the time the operation began may not be declared a nuisance by virtue of changed conditions in and about the locality of the operation after it has been in operation for more than one year. See NDCC § 42–04–02.[2] This legislation went into effect 1 July 1981, and is now contained in NDCC Chapter 42–04. It effectively protects an agricultural business or enterprise from being declared a nuisance. It also protects a person engaged in an agricultural business or enterprise from having it declared a nuisance because of a change in circumstances.

■ Even though this statute went into effect 1 July 1981 and is not retroactive,[3] it

---

2. NDCC § 42–04–02 provides as follows:
   "Agricultural operation deemed not nuisance. An agricultural operation is not, nor shall it become, a private or public nuisance by any changed conditions in or about the locality of such operation after it has been in operation for more than one year, if such operation was not a nuisance at the time the operation began; except that the provisions of this section shall not apply when a nuisance results from the negligent or improper operation of any such agricultural operation."

3. In *Reiling v. Bhattacharyya,* 276 N.W.2d 237 (N.D.1979), we held that statutes enacted by the Legislature are to be applied prospectively unless the Legislature clearly expresses that they are to be applied retroactively. In this instance the Legislature has not clearly expressed that Chapter 42–04 is to be applied retroactively. See also NDCC § 1–02–10.

contains a clear sense of direction we cannot ignore regarding agricultural business or enterprises in this state. This is especially true in an agricultural state such as North Dakota. While we may not and do not apply NDCC § 42–04–02 retroactively and directly to this situation, nevertheless in determining what legal concept or principle of law should be applied in North Dakota, we can take a sense of direction from the enactment.

■ We therefore conclude that any individual or corporation or partnership that comes to an alleged nuisance[4] has a heavy burden to establish liability.

In this respect it is undisputed the GTA feed plant had been in operation since 1958 and that Harmon Motors had operated its car dealership since 1975. Additionally, Harmon Motors had operated its dealership in the same location for two years before the display lot was expanded. Harmon Motors' employees testified that they initially noticed the dust on the display vehicles after the expansion of the display lot.

■ These factors lead us to conclude that the trial court should have, but erroneously failed to consider and apply the "coming to the nuisance" doctrine to this case. (We, of course, realize that the trial court did not have the benefit of this opinion.) Findings of fact made under this erroneous conception of law are not governed by the clearly erroneous standard of NDRCivP Rule 52(a). *Young v. Hamilton,* 332 N.W.2d 237 (N.D.1983). Consequently, because the trial court did not apply this doctrine to the factual circumstances of the instant case, we believe that the trial court's findings are not governed by the "clearly erroneous" standard and, furthermore, the trial court erroneously concluded that the activities of GTA constituted a nuisance.[5]

■ In North Dakota common law does not apply where the Legislature has enacted a law on a specific topic. NDCC § 1–02–01. NDCC Ch. 42–01, amongst other things, defines a nuisance. Thus the common-law nuisance concept does not apply. A private nuisance is not separately defined, which leaves no doubt that in order for something to be a private nuisance it must first come within the statutory definition of a nuisance as set out in § 42–01–01. The trial court made no findings that clearly bring the activities of GTA within the statutory definition of a nuisance. However, the trial court found that dust came from the GTA operation, but this, per se, does not make it a statutory nuisance.

■ Nevertheless, Harmon Motors failed to establish how, or in what manner, or by what means GTA omitted to perform a required duty. We are not aware of any law regulating the emission of dust under the circumstances of this case, and none was called to our attention. Harmon Motors did not contend or establish that GTA violated any statute, ordinance, or regulation in operating its business as it did. It seemingly relied upon a principle of law expressed by maxims of jurisprudence found in NDCC § 31–11–05(5) which states, "One must so use his own rights as not to infringe upon the rights of another." However, another maxim, NDCC § 31–11–05(16) exists, having equal application, which states: "Between rights otherwise equal the earliest is preferred." GTA was the earliest.

More significantly, Harmon Motors failed to identify any law that imposed a duty upon GTA from doing what it did. Our court, in *Langer v. Goode,* 21 N.D. 462, 131 N.W. 258 (1911), in which the plaintiff contended that the defendant maintained a nuisance by not destroying wild mustard, said that the rights referred to in § 31–11–05(5) meant legal rights which did not in-

---

4. We are not implying that we believe that GTA's activities constituted a nuisance. The facts of this case are quite dissimilar to *Thorson v. City of Minot,* 153 N.W.2d 764 (N.D. 1967).

5. Although we have reservations concerning the method used by the trial court to compute damages, because of our resolution of the nuisance issue we need not consider that question.

clude all rights determined by our moral and ethical standards. More importantly, the court held that in the absence of a duty being prescribed by law, or the county commissioners, to destroy certain weeds, "then no duty devolved upon the defendant, and in such a case his failure to destroy the weeds would not be an unlawful act or omission according to the definition [6] of 'unlawful' set forth in Section 5366." *Langer v. Goode,* 131 N.W. at 261. We earlier stated that Harmon Motors did not establish any law or regulation imposing such a duty upon GTA.

For the reasons stated in this opinion, the judgment is reversed.

ERICKSTAD, C.J., and VANDEWALLE and PAULSON, JJ., concur.

PEDERSON, Justice, concurring specially.

I do not agree that the "clearly erroneous" standards do not apply in this case. The judgment still should be reversed because, when applying Rule 52(a), NDRCivP, it is apparent that Finding of Fact No. XV, which is crucial to the judgment, was obviously "induced by an erroneous view of the law." See, *e.g., Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641, 644 (N.D.1976).

There is a grey area between conclusory findings and conclusions of law. *Eszlinger v. Wetzel,* 326 N.W.2d 215, 217 (N.D.1982); *Voth v. Voth,* 305 N.W.2d 656 (N.D.1981); *Backhaus v. Renschler,* 304 N.W.2d 87 (N.D. 1981); *Steckler v. Miller & Holmes,* 303 N.W.2d 560 (N.D.1981). In some situations the distinction may be one of semantics. When, on appeal, the trial court decision is "confirmed," little concern is expressed about the "concisely stated" reasons written by the justices as required by Article VI, § 6, North Dakota Constitution. Every opinion becomes a part of precedent, however, and in the case of Rule 52(a), we have created such a variety of "gloss" that the language of the rule itself has become all but meaningless.

Rule 52(a) requires the trial court to "find the facts specially and state separately its conclusions of law *thereon*" in "all actions tried upon the facts" by the court. [Emphasis supplied.] Except for a short period of time in territorial days under Laws of Dakota, 1862, Civil Procedure, Art. III, Ch. VIII, § 277, when trial judges were explicitly *not* required to make "a finding" except when requested, trial judges have been required "in giving the decision the facts found and the conclusions must be separately stated." See Revised Codes, Territory of Dakota, 1877, Code of Civil Procedure, Art. VI, Ch. 12, § 267 (apparently approved January 7, 1863). We have not since been without a statute or rule imposing this requirement upon trial judges.

The only significant variable that my research has disclosed is that from the enactment of the Newman Act in 1893 (Ch. 82, S.L.1893, variously numbered in the codified laws over the years) until the repeal of § 28-27-32, NDCC in 1971 (Ch. 311, § 2, S.L.1971), this court was directed to try questions of fact anew on appeal. Rule 52(a), which had been adopted in 1957, was amended after the repeal of the Newman Act, by adding: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We have often said either that we follow federal court interpretations of Rule 52 because we adopted the rule from the Federal Rules of Civil Procedure, or that federal court interpretations are "highly persuasive." *In Re Estate of Elmer,* 210 N.W.2d 815, 820 (N.D.1973). Little attention has been afforded to the precedent established by our own court in cases such

6. Section 5366 is now NDCC § 9-08-01, and contains the same language:

"Provisions that are unlawful.—Any provision of a contract is unlawful if it is:

1. Contrary to an express provision of law;

2. Contrary to the policy of express law, though not expressly prohibited; or

3. Otherwise contrary to good morals."

as Chief Justice Bartholomew's enlightening opinion in *Jasper v. Hazen,* 4 N.D. 1, 58 N.W. 454 (1894). We could make more adequate use of this court's own precedent, particularly the early decisions, if the full text were added to the publisher's data bank.

The changes in the statutes and the rules have had little, if any, effect on the opinions produced by this court. We appear to be impelled to find ways to rephrase the rule to make it appear that we are not trying fact issues de novo in some cases, and to make it appear, in other cases, that we really give deference to trial court determinations, even though we really wouldn't have made that determination if we had been the trial judge.